UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KAREN BOGGS,                          :
                                      :   NO. 1:03-CV-00416
            Plaintiff,                :
                                      :
                                      :   **OPINION & ORDER**
    v.                                :
                                      :
                                      :
FLUOR FERNALD, <u>et</u> <u>al</u>.,   :
                                      :
            Defendants.               :


        Plaintiff Karen Boggs filed a Motion for Summary
Judgment on March 1, 2005 (doc. 21).  The remaining Defendant Lee
McDaniels, proceeding <u>pro se</u> in this matter, did not respond to
Plaintiff's Motion.  The Motion is now ripe for ruling.

**FACTS & PROCEDURAL HISTORY**

        Plaintiff Karen Boggs (hereinafter "Boggs") began
her employment with Flour Fernald's Southern Waste Unit
(hereinafter "SWU") on May 28, 2002 as a truck driver (<u>Id</u>.).
Defendant Lee McDaniels (hereinafter "McDaniels") was the Project
Manager for the SWU (<u>Id</u>.).  McDaniels was Boggs' supervisor (<u>Id</u>.).

        In June of 2002, Boggs injured her ankle while
exiting a water truck at the SWU (<u>Id</u>.).  Boggs was transferred via
ambulance to a nearby hospital (<u>Id</u>.).  According to Boggs'
deposition, McDaniels had developed a sexual attraction for her
(<u>Id</u>.).  After her accident, McDaniels followed the ambulance to the
hospital instead of notifying Boggs' union steward of her injury

pursuant to company policy (Id.). While at the hospital, Boggs was administered medication which caused her to be groggy (Id.). Boggs also received a prescription for medication (Id.). Boggs maintains that she was, at this time, entirely incapacitated by pain and medication (Id.). McDaniels still had not notify Boggs' union steward (Id.). Upon release from the hospital, McDaniels drove Boggs to a hotel room that Boggs stayed in during the work-week with a co-worker Kim McClurg (hereinafter "McClurg") (Id.).

McClurg was not present in the hotel room upon McDaniels' and Boggs' arrival (Id.). McDaniels assisted Boggs in entering the room and helped her to bed (Id.). McDaniels then left taking Boggs' prescription to be filled (Id.). Boggs was still incapacitated and groggy as a result of the medication and fell asleep waiting for McDaniels to return with her prescription (Id.). When Boggs awoke McDaniels was kissing her (Id.). Boggs was upset and surprised by McDaniels' behavior and told him that she was a married woman and that he should never kiss her again (Id.). McDaniels assured Boggs that it would never happen again (Id.).

The day after Boggs' accident she was still incapacitated from the medication (Id.). As a result, she was placed on light duty by Flour Fernald (Id.). Boggs was working with McDaniels and in Boggs' mind everything seemed to be back to normal (Id.). However, by lunch time the day following the accident, Boggs was experiencing severe pain and desired to return

-2-

to her hotel room (Id.).  Boggs had no means of transportation to return to the hotel room (Id.).  McDaniels offered to drive Boggs back to the hotel (Id.).  Boggs asserts that she assumed McDaniels would respect her request made the previous day (Id.).  McDaniels drove Boggs to the hotel and helped her into her room (Id.).  However, upon arrival at her room McDaniels again tried to kiss Boggs (Id.).  Boggs protested (Id.).  Boggs reminded McDaniels that she was a married woman and did not appreciate his advances (Id.).

McDaniels became very upset and threatened Boggs stating that he would hate for her to lose her salary and medical coverage for her children (Id.).  McDaniels then left (Id.).  Boggs was panicked and concerned about her job (Id.).  The following day Boggs went home to consult with her physician about the injury to her ankle (Id.).  Boggs remained home for the next three days and during that time McDaniels phoned her house five times (Id.).  During one of these telephone calls, McDaniels told Boggs that she better return to work soon because Flour Fernald would not call her back to work if she took more time off (Id.).

Boggs returned to work on June 17, 2002 (Id.).  She was placed on light duty in the office area in close proximity to McDaniels (Id.).  When other workers were not in the office, McDaniels repeatedly insisted that Boggs go out to dinner with him (Id.).  Boggs politely, but persistently declined (Id.).  Boggs reported that McDaniels stated that she should not be "put off" by

-3-

his propositions because it was not as if he were "asking her to fuck" (<u>Id</u>.).  Boggs finally told McDaniels that she had absolutely no interest in going to dinner with him, kissing him, or having sexual intercourse with him (<u>Id</u>.).

On June 21, 2002, Boggs was assigned to drive a pickup truck as a utility driver because the pickup truck had an automatic transmission and could be driven despite her injured ankle (<u>Id</u>.).  Boggs believed that McDaniels would cease harassing her now that she had been assigned light duty out of the office (<u>Id</u>.).  McDaniels' behavior, however, did not cease (<u>Id</u>.). McDaniels insisted that Boggs carry her cell phone with her so that he could contact her at any minute and call her back to the office (<u>Id</u>.).  Boggs maintains that McDaniels would call her on the cell phone and demand she return to the office for no apparent reason (<u>Id</u>.).  McDaniels continued commenting to Boggs about how attractive she was and insinuated that she and McClurg were involved in a lesbian relationship (<u>Id</u>.).

Up to this point, Boggs had not told anyone else about McDaniels' behavior because she feared that she would lose her job (<u>Id</u>.).  Ultimately, however, Boggs confided with McClurg (<u>Id</u>.).  McClurg advised Boggs to not report McDaniels' behavior to the company because she did not feel the company would believe Boggs without clear evidence (<u>Id</u>.).  However, McClurg did advise Boggs to tell her husband (<u>Id</u>.).

-4-

Boggs continued her employment and attempted to avoid McDaniels as often as she could (Id.). However, McDaniels continued to threaten her employment (Id.). On June 24, 2002, Boggs' husband came to the SWU to visit Boggs (Id.). Boggs and her husband were in her hotel room near the SWU when she received a phone call from McDaniels (Id.). When McDaniels became aware that Boggs' husband had come to town to visit her he became irate on the telephone (Id.). He cursed at Boggs and demanded to know why Boggs had not told him that her husband was coming (Id.). Boggs had not yet told her husband about McDaniels, despite McClurg's advice to do so (Id.). Boggs had not told her husband because she was afraid he might react negatively (Id.). Boggs still did not tell her husband, instead she acted as if the call from McDaniels was routine (Id.).

The following day at work, Boggs continued her efforts to avoid McDaniels (Id.). However, McDaniels called Boggs into his office and began berating her again about her husband's visit (Id.). Boggs told McDaniels that her husband's visit was none of his business (Id.). Boggs managed to avoid McDaniels through the end of the following day (Id.). Two days later, on June 26, 2002, McDaniels insisted that Boggs visit him in his office (Id.). When Boggs arrived at his office, McDaniels walked over to her truck and demanded to know why she had been avoiding him (Id.). Boggs warned McDaniels to stay away from her (Id.).

-5-

McDaniels then reached into Boggs' truck and grabbed Boggs' breast violently, yelling at Boggs angrily that she needed to "buy a fucking vibrator" to relieve some stress (Id.).  Boggs pushed McDaniels' hand away and drove off (Id.).

The following day when Boggs arrived at work, McDaniels told her that he had been watching Boggs and McClurg's hotel room (Id.).  McDaniels called her into his office, shut the door, and physically accosted her (Id.).  Boggs shoved McDaniels away, threatened to scream if he did not leave her alone, and ran out of the office (Id.).  Subsequently, McClurg decided to directly confront McDaniels about his behavior (Id.).  McClurg told McDaniels to leave Boggs alone because she was married and had children (Id.).  McDaniels confessed to McClurg that he was in love with Boggs and consequently could not leave her alone (Id.).  McClurg asked McDaniels why he had attempted to kiss Boggs (Id.).  He responded that he was infatuated with Boggs (Id.).  McClurg pleaded with McDaniels to leave Boggs alone (Id.).  McDaniels became angry with McClurg and threatened her job as well (Id.).

Shortly thereafter, McDaniels told Boggs that she should not have involved McClurg (Id.).  Throughout the following weeks, McDaniels persistently threatened McClurg and Boggs with the loss of their jobs in an upcoming reduction in force (Id.).  McDaniels' behavior progressed to what was viewed as even more disturbing when he admitted to Boggs that he had driven over two

-6-

hours to her home town on several occasions (Id.). McDaniels also began asking Boggs about her sexual relations with her husband (Id.).

McClurg convinced Boggs to tape record McDaniels admitting his conduct, so the two would have something concrete with which to lodge a complaint (Id.). On July 23, 2002, Boggs recorded a conversation with McDaniels in which he admitted to trying to kiss Boggs and also to grabbing her (Id.). McDaniels also verified his obsessive feelings toward Boggs and asserted that he had been trying to stay away from her (Id.). McDaniels was also recorded stating that if he wanted Boggs fired he would simply fire her (Id.). At the end of the recorded conversation, McDaniels stated that Boggs did not need to worry about her job, but demanded "now drop your drawers and let's fuck" (Id.). McDaniels in his deposition testimony confirms he made these comments (Id.).

Boggs and McClurg took the tape to their union steward and played it for him (Id.). The union steward initiated a formal complaint process with Flour Fernald (Id.). Flour Fernald concluded that McDaniels had sexually harassed Boggs (Id.). McDaniels was terminated from his position for sexually harassing Boggs in August of 2002 (Id.). Boggs had to take medical leave from her job because she had become emotionally unable to work (Id.). Boggs sought counseling and medical treatment as a result (Id.).

-7-

Boggs filed her Complaint with this Court on June 10, 2003 (doc. 1). In November 2004, Boggs voluntarily dismissed with prejudice Flour Fernald as a defendant (doc. 18). What remained were allegations against McDaniels for violation of Ohio Revised Code Chapter 2112, intentional infliction of emotional distress, and assault and battery. With McDaniels as the only remaining Defendant, Boggs filed her Motion for Summary Judgment now before the Court (doc. 21).

**APPLICABLE LEGAL STANDARD**

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. See id. at 321; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992);

-8-

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Guarino, 980 F.2d at 405.

As the Supreme Court stated in Celotex, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, "'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.'" Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991).

-9-

**ANALYSIS**

Boggs maintains that no genuine issue of material fact exists as to whether McDaniels sexually harassed her in violation of Ohio Revised Code Chapter 4112 (doc. 21). An individual can be held liable for sex discrimination under chapter 4112. See e.g., Genaro v. Cent. Transp., 703 N.E.2d 782 (Ohio 1999). Boggs aptly notes that in order to establish a claim of hostile work environment based on sexual harassment, a plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "term, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the harassment was committed by a non-supervisor employee and the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action (doc. 21 citing Hampel v. Food Ingredients Specialities Inc., 729 N.E.2d 726, 732-33 (Ohio 2000)).

Boggs notes that no evidence exists on the record that she welcomed McDaniels' behavior (doc. 21). In fact, Boggs ultimately complained of McDaniels' conduct to Flour Fernald and her union steward, tape recorded a conversation with McDaniels in order to better lodge her complaint (a recorded conversation in

which McDaniels admitted the conduct), and complained directly to McDaniels and her friend McClurg.  All of this behavior leads one to conclude that Boggs did not welcome McDaniels' behavior.

The record is also quite clear that McDaniels' conduct toward Boggs was based on his sexual attraction for her. McDaniels admits to such conduct both in the audio-taped conversation and in his deposition.  McDaniels admitted to McClurg that he could not leave Boggs alone because he was infatuated with her.  McDaniels' remarks to Boggs were overtly sexual in nature - for example his comment to "now drop your drawers and let's fuck." Harassment to be based on sex, under Ohio and Sixth Circuit law, need not be of the explicit kind found in the instant matter.  For example in Williams v. General Motors Corp., 187 F.3d 553, 565 (6th Cir. 1999), the Sixth Circuit stated:

> [H]arassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the based on sex requirement . . . the conduct underlying a sexual harassment claim need not be overtly sexual in nature. Any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the Harris standard, constitute a hostile environment in violation of Title VII.

Id. at 565.  It is clear that the behavior was based on sex; yet, at the very least, it was of the variety considered sufficient in Williams.

To show that the harassment was sufficiently severe

-11-

or pervasive so as to affect her work, Boggs need only "show that the harassment made it more difficult to do [her] job." Davis v. Monsanto Chem. Co., 858 F.2d 345, 349 (6th Cir. 1988). McDaniels' conduct was undoubtedly severe and pervasive. His pursuit of Boggs was physically intrusive and violent. He forcibly tried to kiss Boggs, doing so even while she was incapacitated on medication. He grabbed her breasts, harassed her on the phone, interfered in her relationship with her husband, and threatened her employment. This conduct continued despite requests by Boggs that it cease. As a result of the level of harassment faced by Boggs, she required leave from work and medical treatment. Faced with the facts on the record, no reasonable person could conclude that McDaniels' conduct was anything other than pervasive and severe.

Lastly, no dispute exists as to whether McDaniels was Boggs' supervisor. Boggs has established that McDaniels harassment was unwelcome, based on sex, pervasive and severe, and that McDaniels was Boggs' supervisor. Boggs has met her initial burden of showing the absence of a genuine issue of material fact as to all essential elements of her Chapter 2112 claim; and, McDaniels has failed to set forth specific facts showing there is a genuine issue for trial. Accordingly, summary judgment in Boggs' favor as to her claim of sexual harassment pursuant to Ohio Revised Code Chapter 2112 is granted.

Boggs also alleges that McDaniels' behavior

-12-

constituted intentional infliction of emotional distress (doc. 21).
The Ohio Supreme Court has defined the tort of intentional
infliction of emotional distress as extreme and outrageous conduct
which intentionally or recklessly causes severe emotion distress.
Yeager v. Local 20, Teamsters, Chauffeurs, 453 N.E.2d 666, 671
(Ohio 1983).  To qualify as conduct considered under this standard,
it must be conduct that would lead an average member of the
community to exclaim "outrageous."  Id.  To establish a claim for
intentional infliction of emotional distress, a plaintiff must
demonstrate:

> (1) that the actor either intended to cause
> emotional distress or knew or should have
> known that actions taken would result in
> serious emotional distress to the plaintiff;
>
> (2) that the actor's conduct was so extreme
> and outrageous as to go beyond all possible
> bounds of decency and was such that it can be
> considered as utterly intolerable in a
> civilized community . . . ;
>
> (3) that the actor's actions were the
> proximate cause of plaintiff's psychic injury;
> and
>
> (4) that mental anguish suffered by plaintiff
> is serious and of a nature that no reasonable
> man could be expected to endure.

Garrison v. Bobbitt, 731 N.E.2d 216 (Ohio App. 1999) (internal
citations omitted).

Based upon the facts in the record it can not be
disputed that McDaniels knew or should have known that his conduct

-13-

would result in serious emotional distress to Boggs.  Repeated fondling, sexual innuendos, bodily invasions, and threats of losing one's job by a male supervisor to a female employee undoubtedly would lead to serious emotional distress in the female employee. No reasonable individual could conclude otherwise.  Furthermore, McDaniels' conduct would lead an average member of the community to exclaim "outrageous."  It is also clear from the evidence on the record that McDaniels' conduct was the proximate cause of Boggs' serious emotional distress.  Boggs has sought treatment for severe anger, depression, and anxiety, which the psychological and medical professionals treating her attributed to McDaniels' actions (doc. 21).

Lastly, the Court must address whether Boggs' emotional distress was serious.  Boggs sought medical treatment specifically for the distress caused by McDaniels' behavior (<u>Id</u>.). Boggs points to her medical records to show that her emotional distress was serious (<u>Id</u>.).  Based upon the record of evidence before the Court, noting that McDaniels has proffered no evidence to the contrary, the Court finds that viewed objectively, a reasonable person could only conclude that Boggs suffered serious emotional distress.

Boggs has met her initial burden of showing the absence of a genuine issue of material fact as to all essential elements of her intentional infliction of emotional distress claim;

-14-

and, McDaniels has failed to set forth specific facts showing there is a genuine issue for trial. Accordingly, summary judgment in Boggs favor as to her claim of intentional infliction of emotional distress is warranted.

Boggs' last claim is one for battery and assault (Id.). The Ohio common law torts of assault and battery involve an intentional, unwarranted invasion of another's personal security, either by the threat of offensive or harmful physical contact, as in assault, or by such contact itself, as in battery. See e.g., Smith v. John Deere Co., 614 N.E.2d 1148 (Ohio App. 1993) (discussing assault) and Love v. City of Port Clinton, 524 N.E.2d 166 (Ohio 1988) (discussing battery). The facts on the record before the Court, consist of an admission by McDaniels on the audiotape that he grabbed Boggs' breast. Furthermore, during deposition McDaniels gave no legitimate reason for grabbing Boggs' breasts (doc. 21). Boggs did not invite or give permission to McDaniels to grab her breasts. Additionally, McDaniels kissed and attempted to kiss Boggs without her permission. He also accosted Boggs in his office by pushing her against the wall. These acts - the grabbing of Boggs' breasts, the kissing, and the shoving of Boggs against McDaniels' office wall - constitute an unwarranted invasion of Boggs' personal security by actual offensive physical contact.

Boggs has met her initial burden of showing the

-15-

absence of a genuine issue of material fact as to all essential elements of her assault and battery claim; and, McDaniels has failed to set forth specific facts showing there is a genuine issue for trial. Accordingly, the Court finds that McDaniels both assaulted and battered Boggs.

**CONCLUSION**

The Court hereby GRANTS Plaintiff's Motion for Summary Judgment for all claims against Defendant Lee McDaniels (doc. 21). The only remaining issue to be determined in this matter is one of damages. A Final Pre-Trial Conference is scheduled for May 31, 2005 at 3:00 P.M. The Parties should submit their proposed, joint Final Pre-Trial Order, taking into account the Court's Order, prior to the May 31st Conference.

SO ORDERED.

Dated: May 24, 2005            s/S. Arthur Spiegel
                               S. Arthur Spiegel
                               United States Senior District Judge

-16-